UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------X          Case No.

People of the State of New York, by LETITIA JAMES,
Attorney General of the State of New York,

                                                        Plaintiff,

                              -against-

BEVELYN BEATTY and EDMEE CHAVANNES

                                           Defendants.

--------------------------------------------------------------------------X


**MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR A PRELIMINARY INJUNCTION**

**LETITIA JAMES**
New York State Attorney General
28 Liberty St., 20th Floor
New York, New York 10005
(212) 416-8250
Plaintiff

By:      _/s/ Sandra Pullman_____
          Sandra Pullman
          Senior Counsel, Civil Rights Bureau

          Heather McKay
          Assistant Attorney General
          (*pending admission to the SDNY*)

# TABLE OF CONTENTS

## Contents

PRELIMINARY STATEMENT ............................................................................... 1

FACTUAL BACKGROUND ................................................................................... 3

FEDERAL, STATE, AND CITY CLINIC ACCESS LAWS .................................. 12

A.　　　Federal and State Law .................................................................. 12

B.　　　City Law ....................................................................................... 12

ARGUMENT ........................................................................................................ 13

I.　　　PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS OF THE
　　　　CLAIMS ........................................................................................ 13

A.　　　Defendants' Actions Violate Federal and State Clinic Access Laws .................. 14

　　1.　　Defendants Engage in Force, Threats of Force, and Physical Obstruction ......... 14

　　　　a. Defendants Have Engaged in Force………………………………………...……14
　　　　b. Defendants Deliver Threats of Force………………………………………..……16
　　　　c. Defendants Engage in Physical Obstruction…………………………………19

　　2.　　Defendants Possess the Requisite Intent and Motives Under Federal and State
　　　　Law ............................................................................................... 22

B.　　　Defendants' Actions Violate the NYC Clinic Access Act .................................. 23

　　1.　　Defendants' Conduct is Prohibited by the City Law ............................................ 24

　　　　a. Defendants Routinely Follow and Harass People Within 15 Feet of the
　　　　Clinic………………………………………………………………………………24
　　　　b. Defendants Engage in Conduct That Places People in Reasonable Fear of
　　　　Physical Harm………………………………………………………………………25
　　　　c. Defendants Interfere with the Operation of the Clinic in General……………26

　　2.　　There Is No Intent Requirement Under the City Law ........................................... 26

II.　　PLAINTIFF DEMONSTRATES IRREPARABLE HARM ........................... 26

A.　　　Irreparable Harm Is Presumed under FACE and the NY Clinic Access Act ........ 27

B.　　　Defendants Are Causing Irreparable Harm ........................................................... 28

III.　　PLAINTIFF DEMONSTRATES THAT INJUNCTIVE RELIEF WOULD
　　　　PROMOTE THE PUBLIC INTEREST ...................................................... 29

IV.　　THE REQUESTED RELIEF IS NARROWLY TAILORED TO ADDRESS
　　　　DEFENDANTS' VIOLATIONS OF LAW ................................................. 32

CONCLUSION ...................................................................................................... 36

i

# TABLE OF AUTHORITIES

**Cases**

*Am. Freedom Def. Initiative v. Metro. Transp. Auth.*,
815 F.3d 105 (2d Cir. 2016) .................................................................................18, 19

*Cheffer v. Reno*,
55 F.3d 1517 (11th Cir. 1995) ......................................................................................16

*City of New York v. Golden Feather Smoke Shop, Inc.*,
597 F.3d 115 (2d Cir. 2010)..........................................................................................27

*Defario v. City of Syracuse*,
193 F. Supp. 3d 119 (N.D.N.Y. 2016) ..........................................................................30

*Devos, Ltd. v. Record*,
No. 15-cv-6916, 2015 U.S. Dist. LEXIS 172929 (E.D.N.Y. Dec. 24, 2015) ...............18

*Dickson v. Ashcroft*,
346 F.3d 44 (2d Cir. 2003)............................................................................................14

*Hill v. Colorado*,
530 U.S. 703 (2000).......................................................................................................33

*Madsen v. Women's Health Ctr.*,
512 U.S. 753 (1994)...........................................................................................31,33,34

*McCullen v. Coakley*,
134 S. Ct. 2518 (2014)...........................................................................................25,34

*Murray v. Lawson*,
138 N.J. 206 (1994) ......................................................................................................34

*New York v. Actavis PLC*,
787 F.3d 638 (2d Cir. 2015) .........................................................................................13

*New York v. Cain*,
418 F. Supp. 2d 457 (S.D.N.Y. 2006) .................................................................. *passim*

*New York v. Kraeger*,

160 F. Supp. 2d 360 (N.D.N.Y. 2001) ........................................................................ *passim*

*New York v. Operation Rescue Nat'l,*
273 F.3d 184 (2d Cir. 2001) ..................................................................................... *passim*

*New York State NOW v. Terry,*
886 F.2d 1339 (2d Cir. 1989) ........................................................................... 29,32

*NM v. Hebrew Acad. Long Beach,*
155 F. Supp. 3d 247 (E.D.N.Y. 2016) ....................................................................18

*Oliva v. Brookwood Coram I, LLC,*
No. CV 14-cv-2513, 2015 U.S. Dist. LEXIS 179084 (E.D.N.Y. Nov. 30, 2015) ........................12

*Oneida Nation of New York v. Cuomo,*
645 F.3d 154 (2d Cir. 2011) ..........................................................................13,30

*Planned Parenthood of Shasta-Diablo, Inc. v. Williams,*
10 Cal. 4th 1009 (1995) ...................................................................................34

*Schenck v. Pro-Choice Network of Western N.Y.,*
519 U.S. 357 (1997) ..............................................................................25,33,34

*State of New York ex rel. Spitzer v. Operation Rescue,*
273 F.3d 184 (2nd Cir. 2001) ................................................................................4

*SymQuest Grp., Inc. v. Canon U.S.A., Inc.,*
No. 15-cv-4200, 2015 U.S. Dist. LEXIS 114898 (E.D.N.Y. Aug. 7, 2015) ...............................12

*Tutor Time Learning Ctrs., LLC v. KOG Indus.,*
No. 1:12-CV-4129, 2012 U.S. Dist. LEXIS 162124 (E.D.N.Y. Nov. 13, 2012) ...........................30

*United States v. Burke,*
15 F. Supp. 2d 1090 (D. Kan. 1998) ..................................................................29,30

*United States v. Davila,*
461 F.3d 298 (2d Cir. 2006) ..............................................................................16

*United States v. Dinwiddie,*
76 F.3d 913 (8th Cir. 1996) ..........................................................................16,17,34

*United States v. Dugan,*
450 F. App'x 20 (2d Cir. 2011) .............................................................................22

*United States v. Gilbert,* 884 F.2d 454, 457 (9th Cir. 1989)………………………………………..17

*United States v. Gregg,*

32 F. Supp. 2d 151 (D.N.J. 1998) ........................................................................19,20

*United States v. Hill,*
893 F. Supp. 1034 (N.D. Fla. 1994)........................................................................12

*United States v. Lindgren,*
883 F. Supp. 1321 (D.N.D. 1995)........................................................................20,31

*United States v. McMillan,*
946 F. Supp. 1254 (S.D. Miss. 1995) ("McMillan I")........................................ *passim*

*United States v. McMillan,*
53 F. Supp. 2d 895 (S.D. Miss. 1999) ("McMillan II") ............................................16

*United States v. Narco Freedom, Inc.,*
95 F. Supp. 3d 747 (S.D.N.Y. 2015)........................................................................27

*United States v. Roach,*
947 F. Supp. 872 (E.D. Pa. 1996) ............................................................... 19,28,30

*United States v. Scott,*
958 F. Supp. 761 (D. Conn. 1997)........................................................................16,32,33

*United States v. Scott,*
No. 3:95-CV-1216, 1998 U.S. Dist. LEXIS 6716 (D. Conn. Mar. 16, 1998) ..............33

*United States v. Turner,*
720 F.3d 411 (2d Cir. 2013)........................................................................16

*United States v. Weslin,*
156 F.3d 292 (2d Cir. 1999)........................................................................22

*United States v. White,*
893 F. Supp. 1423 (C.D. Cal. 1995) ........................................................................20,33

*United States v. William Savran & Assoc.,*
755 F. Supp. 1165 (E.D.N.Y. 1991) ........................................................................28

*Vringo, Inc. v. ZTE Corp.,*
No. 14-cv-4988, 2015 U.S. Dist. LEXIS 71919 (S.D.N.Y. June 3, 2015) ..................12

*Ward v. Rock Against Racism,*
491 U.S. 781 (1989)........................................................................33

*Winter v. NRDC, Inc.,*
555 U.S. 7 (2008)........................................................................30

**Statutes**

18 U.S.C. § 248(a)(l)..................................................................................... *passim*

18 U.S.C. § 248(c)(3)........................................................................................28

18 U.S.C. § 248(e) .................................................................................16,19,20

N.Y. Civ. Rights Law § 79-m ........................................................................ 1,28,30

N.Y. Penal Law § 240.70............................................................................... *passim*

N.Y. Penal Law § 240.71...............................................................................27,30

N.Y.C. Admin. Code § 10-1002 .....................................................................25

N.Y.C. Admin. Code § 10-1003 .................................................................... *passim*

**Other Authorities**

H.R. Rep. No. 103-306 (1993), reprinted in 1994 U.S.C.C.A.N. 699..........................................28

Plaintiff, the People of the State of New York, by Letitia James, Attorney General of the State of New York ("OAG"), respectfully submits this Memorandum of Law and accompanying declarations and attached exhibits in support of Plaintiff's motion for a preliminary injunction. Plaintiff brings this motion to enjoin the obstructive, harassing, threatening, and violent conduct by Defendant Bevelyn Beatty and Defendant Edmee Chavannes at Planned Parenthood of Greater New York's Manhattan Health Center ("the Center") located at 26 Bleecker Street, New York, New York.  Defendants' conduct—much of which is captured on videos, which are attached to this motion—violates the Freedom of Access to Clinic Entrances Act ("FACE"), 18 U.S.C. § 248(a)(l), the New York State Clinic Access Act ("NY Clinic Access Act"), N.Y. Civ. Rights Law § 79-m, and the New York City Access to Reproductive Health Care Facilities Act 9 ("NYC Clinic Access Act"), N.Y.C. Admin. Code § 10-1003.

## PRELIMINARY STATEMENT

The Manhattan Health Center, an outpatient surgery center in downtown Manhattan that provides a full array of reproductive health services for women, has long been a target of unlawful anti-abortion activity.  In 2010, federal prosecutors convicted two men of criminal violations of the FACE Act by blocking the door to the clinic.[1]  A few years before that, the OAG filed suit in the Southern District of New York against two protesters who used their bodies to block the door to the Center; screamed inside the Center, threatened staff; and pushed and shoved escorts.  In that case, the Southern District of New York found the exterior of the clinic to be "a scene filled with tension, brimming with anger, and infused with the expectation of imminent danger."  *New York ex rel. Spitzer v. Cain*, 418 F. Supp. 2d 457, 460 (S.D.N.Y. 2006).  The court accordingly enjoined

---

[1] *See* Press Release, FBI, Two Men Found Guilty in Manhattan Federal Court of Violating the Freedom of Access to Clinic Entrances Act (April 27, 2010), *available at* https://archives.fbi.gov/archives/newyork/press-releases/2010/nyfo042710a.htm

the defendants, their agents and representatives, and all persons acting on their behalf or in concert with them from committing further unlawful acts and from entering a 30 foot by 18 foot buffer zone around the clinic. *Id.* at 488-89.

Defendants Bevelyn Beatty and Edmee Chavannes are the latest violent protesters to create such a scene of tension, anger, and expectation of imminent danger outside Center, albeit with a modern twist. First, the Defendants record and publicly post many of their unlawful activities, including their intention to shut down the Center, and they are further captured on cell phone videos by staff and escorts who are on the receiving end of their harassment and abuse. Indeed, every violation of law described in this memo is depicted on film in one or more of the accompanying exhibits.

Next, the Defendants harass clinic staff and patients during the COVID-19 global pandemic, which has raged across the United States and especially New York City, killing over 460,000 people in the country in the past year. They flaunt emergency orders designed to slow the spread of the virus and protect public health and safety, and they have capitalized on the health risk they posed to staff and patients, by shouting at patients and staff from close range and without face coverings. Instead of altering their harassing activities in any way in light of this once-in-a-century global crisis, they have become even more violent, threatening, and physically obstructive as they have torn down police barricades intended to enforce social distancing, shoved staff and escorts aside, slammed an escort's hand in the clinic's door, and taunted all those who asked them to keep their distance and cover their noses and mouths. They intend to, and do, make the simple act of entering the clinic hazardous and unreasonably difficult for all those who sought to enter.

The times may have changed, but the laws remain the same: those who attempt to interfere with the provision of reproductive health services through violence, threats, and physical

obstruction do so in violation of clinic access laws.  Plaintiff respectfully requests that this court enjoin future violations of law and establish a buffer zone that will once again ensure safe access to reproductive health care for patients and staff.

## FACTUAL BACKGROUND

For more than 100 years, Planned Parenthood has delivered reproductive health care, sex education, and medical information to millions of women and men worldwide.  The Manhattan Health Center is located in a residential neighborhood at the corner of Bleecker and Mott Streets and provides comprehensive gynecological services, including routine check-ups, birth control, pregnancy care and testing (like breast, cervical, testicular, and prostate cancer screening), vaccines, and abortions.  The Center also provides STD and HIV testing, counseling, and treatment.

The Manhattan Health Center's entrance is directly at the edge of a public sidewalk.  The Center's entrance door is approximately 30 feet south of the edge of Bleecker Street and opens directly onto Mott Street.  The recovery and discharge area of the Center and additional waiting areas are directly above Mott Street on the second floor.  *See* Lyman Decl. Ex. M.

Beginning on or around February 2019, Defendants began protesting on Fridays, and then Saturdays, at the Manhattan Health Center. Lyman Decl. ¶5; Barnett Decl. ¶5.  At one point, they protested at the Center approximately a dozen Saturdays in a row, typically showing up around 7 a.m. and leaving around 11 a.m.  Lyman Decl. ¶5.  One of the Defendants typically stands right at the door to the Center, inches away from a volunteer escort who is responsible for opening the door to the Center, and the other follows patients and staff and yells at them at close range as they passed by. *Id.* at ¶6. Defendants also scream through the glass windows after patients go inside. *Id.* at ¶7. Lyman Decl. Ex. A; Barnett Decl. ¶6.  Defendants' yelling is so loud that it can

be heard in the patient recovery room and the offices up on the seventh floor on the other side of the building.  Verrilli Decl. ¶5.  On at least one occasion, on January 1, 2020, the Manhattan Health Center had to relocate patients from the waiting room into the clinic before it opened because Defendants were screaming so loudly through the glass.  Barnett Decl. ¶8.

Defendant Beatty is a prolific presence on social media, where she routinely posts about her harassment of patients and obstructive activity at a number of abortion clinics.  She shared a video of herself and Chavannes on June 12, 2020, standing in front of the main entrance of a Planned Parenthood clinic in Camden, New Jersey, and refusing to heed a police officer's request to move.  Lyman Decl. Ex. O.  She posted a video of Defendants directly in front of the main entrance of Planned Parenthood Southeastern Pennsylvania on July 3, 2020, shouting at passersby and clinic staff through a loudspeaker.  Lyman Decl. Ex. Q.  On June 26, 2020, Beatty went so far as to enter the clinic under the false pretense that she was seeking an abortion, recording and posting the entire interaction.  Lyman Decl. Ex. P.

Security staff at the Center are also aware that Beatty also has a history of violent activity.  In 2018, she was convicted of assault in Maine, after she was filmed repeatedly hitting another woman in a nightclub, Lyman Decl. ¶30; *State v. Beatty*, Mem. 19-45, May 7, 2019.  As discussed *infra*, she has bragged about the severity of this assault and threatened to do the same to clinic escorts.  Lyman Decl. ¶30.  She has also posted videos of herself firing guns, announcing that she intends to make it a weekly practice.  Lyman Decl. ¶38, Ex. R, S.

Although Defendants stopped coming to the Center for a few weeks in January and February, they resumed their activities in late winter 2020, around the start of the COVID-19 pandemic in New York City.  Barnett Decl. ¶5. At that point, staff, escorts, and patients were concerned because the defendants persisted in getting close to patients, staff, and escorts, while

4

yelling and chanting and refusing to heed requests to maintain six feet of distance, all without wearing masks. Verrilli Decl. ¶6; Betters Decl. ¶12; Lyman Decl. ¶9; Barnett Decl. ¶12. Defendants' behavior has become even more intimidating and disruptive, as they intentionally present a direct risk to the health and safety of patients and staff. Lyman Decl. ¶9; Barnett Decl. ¶12, 13.

Defendants have been very vocal about their refusal to abide by safety precautions during the pandemic.  On July 7, 2020, they were arrested for interrupting a city council meeting in Cape Coral, Florida and screaming about their opposition to COVID-related safety measures.[2]  Beatty has urged others to forgo masks on Facebook, writing, "DO NOT WEAR THAT MASK! IT IS SOFT SUBMISSION."  Lyman Decl. ¶13, Ex. B.  She has also been vocal about her refusal to get a COVID-19 vaccine, telling her followers, in reference to the vaccines, "DON'T DO IT."  Lyman Decl. ¶13, Ex. C.

The ongoing COVID-19 pandemic is the greatest public health emergency in more than a century.  New York State has been in a state of emergency since March 7, 2020, with New York City at its epicenter.  To date, the virus has killed over 460,000 people in the U.S., including more than 36,000 New Yorkers, which is more than ten times the number killed in 9/11.[3]  In response, Governor Cuomo has issued a series of Executive Orders to reduce the spread of the virus by minimizing in-person contact, including requiring social distancing, temporarily banning

---

[2] Michael Braun, *Two of trio arrested at Cape Coral council meeting part of ministry protesting many causes*, Fort Myers News-Press, July 7, 2020, www.news-press.com/story/news/2020/07/07/cape-coral-police-said-they-tried-have-trio-enter-meeting-properly/5389349002/

[3] *See* CDC COVID Data Tracker, Centers for Disease Control and Prevention, available at https://covid.cdc.gov/covid-data-tracker/#cases_casesper100klast7days; Fatalities, New York State Department of Health, available at https://on.ny.gov/2MxLRsJ.

gatherings, and mandating that all individuals over the age of two cover their nose and mouth with a mask or cloth face covering in public.[4]

Rather than comply with these orders, Defendants have instead weaponized the threat of the virus to further intimidate and interfere with the Center's operations.  Lyman Decl. ¶9; Barnett Decl. ¶12.  Defendants refuse repeated requests from patients, staff, and escorts to maintain their distance and wear masks and continue to accost people entering the Center at close range, while mocking staff and escorts' mask usage and desire to avoid close contact with them. Verrilli Decl. ¶6; Betters Decl. ¶12. Defendants' conduct purposely puts patients, staff, and escorts in fear for their health and safety. Lyman Decl. ¶9; Barnett Decl. ¶12, 13.  Ultimately, they force patients and staff to risk exposure to the virus in order to obtain or provide reproductive health services.  *Id.* Meanwhile, their screaming into the windows made it difficult for medical staff to ask patients about their potential symptoms and risk factors upon arrival at the clinic. Barnett Decl. ¶11; Lyman Decl. ¶10.

In May 2020, while thousands of New Yorkers were still testing positive every day, the police provided the Center with barricades to create a narrow path to protect patients and staff from exposure to the virus as they entered the clinic to go to work or to medical appointments.  Lyman Decl. ¶15.  But Defendants refused to respect these basic safety precautions put in place by law enforcement and forced their way inside the barricades, elbowing and shoving aside escorts and staff who tried to stop them, and putting themselves directly in the path between patients and the clinic's door.  *Id*.

On Saturday, May 30, Defendants continually positioned themselves inside the barricades—which had created a six-foot-wide path leading to the door—and refused to move.

---

[4] New York Executive Order ("EO") Nos. 202-202.82, including EO 202.17, issued on April 15, 2020, all of which are available at: https://www.governor.ny.gov/executiveorders.

Lyman Decl. ¶16.  The police arrived, told them to move, and still the women did not; the police ultimately arrested them.  *Id.*  Beatty filmed the encounter and posted it online.  *Id.* at ¶17, Ex. D. An hour and a half after they were released from the precinct, Beatty and Chavannes came right back to the clinic.  *Id.* at ¶16.  They returned to their position inside the barricades and refused to move.  *Id.*

One Saturday in early June 2020, Defendant Chavannes screamed so closely in the ear of a staff member who was trying to walk into the Center to go to work that some of her spit hit him on the head.  Barnett Decl. ¶13.

Later that month, staff at the Center learned that Beatty and Chavannes were organizing a large-scale anti-abortion protest on June 19 and 20, in collaboration with Flip Benham, an anti-abortion activist who was known to Center security for his conviction for stalking an abortion doctor in 2011.  Lyman Decl. ¶19, Ex. E.  In promoting the event online, Defendant Beatty called on others to join her and "declare WAR on PLANNED PARENTHOOD!"  Lyman Decl. ¶21, Ex. F.

Defendants repeated their threats of violence when they arrived at the clinic on June 19, 2020.  On a live video feed Beatty posted to Facebook, she can be heard announcing, "This is war.  We are called to destroy the works of the enemy.  That's what we are doing right now." Lyman Decl. ¶24, Ex. G.  At the end, Beatty turns to the camera and says, "We are going to terrorize this place.  And I want the manager to hear me say that."  She then turns to an escort and threatens her directly, "We are going to terrorize this place. More people are coming. More and more and more people…We are going to terrorize you so good that your business will be over."  *Id.*

Throughout the morning of June 19, Chavannes and Beatty positioned themselves directly in front of the door, obstructing the main entrance to the clinic. Betters Decl. ¶10.  At one point, a patient approached the main entrance, while Chavannes and Beatty stood directly in front of the door, blocking it.  *Id.* at ¶20 and ¶23.   Escorts had to direct the patient to the side door, as Beatty chanted and Chavannes shouted after them.  *Id.* at Ex. B.

Around 9 a.m., Defendant Chavannes began screaming at a staff member who had opened the door to allow another employee to enter the Center.  Verrilli Decl. ¶12.  Chavannes backed the staff member up against the barricade, causing the staff member to bend backwards over it, and shook her finger in staff member's face and screamed, maskless, from inches away, shouting at her, "Do not touch me again! Do you hear me?! Do not touch me anymore!" Verrilli Decl. Ex. A.  Chavannes did not stop until multiple police officers pulled her away.  The staff member managed to record the terrifying interaction from her perspective, Verrilli Decl. Ex. B, C; she was afraid that Chavannes was going to hit her. Verrilli Decl. ¶13.

On June 20, the second day of Beatty and Chavannes' protest, Defendants forcefully and violently attacked the escorts who were attempting to maintain a clear path for patients and staff to enter the clinic through the barricades provided by the police.  First, Defendant Beatty took a running start and rammed her entire body into several escorts who had linked arms in an attempt to block her from entering the police barricades.  Verrilli Decl. Ex. D.  At the same time, Defendant Chavannes took hold of the barricades and began yanking them out of the hands of escorts and staff and throwing them into the street, while screaming at the escorts and staff.  *Id.*

Defendant Beatty's use of force to try to shut down the clinic caused serious bodily injury to a staff member that day.  Around 7 am, Beatty leaned her entire body weight against the door to the Center to keep it closed, while staff and escorts were attempting to open it.  Verrilli Decl.

8

¶25.  In doing so, she slammed the door shut on the hand of a staff member, who cried out,

"She's crushing my hand!"  Beatty saw and heard this but did not move.  Verrilli Decl. Ex. F.

As the staff member continued to try to force the door open, Beatty's weight repeatedly slammed

the door onto the staff member's hand, which became bruised and swollen and required x-rays.

Verrilli Decl. Ex. G.

   Minutes later, Beatty assaulted another escort at the entrance to the clinic.   When a clinic

volunteer reached for the door, Beatty shoved the volunteer back twice — the second time with

so much force that the volunteer tripped backwards over herself.  Lyman Decl. at ¶28, Ex. I. In a

video capturing the latter half of the interaction, the volunteer can be heard saying, "I would like

to get into the clinic."  Lyman Decl. ¶28, Ex. J.  Beatty still refused to move, and instead shoved

the volunteer a third time.  *Id.*  Then, as the volunteer attempted to tug the door open, Beatty

leaned her weight against the door.  *Id.*  A staff member had to push the door open from inside

the clinic to move Beatty aside, finally permitting the volunteer to enter.  Meanwhile, Beatty

continued to try to force the door closed, nearly slamming it on the volunteer's arm.  *Id.*

   Later that morning, at 9:29 a.m., Beatty shoved and then slapped an escort in the face.

Verrilli Decl. ¶29.  After slapping the escort, Beatty lunged and screamed at her while being held

back by another clinic volunteer.  Verrilli Decl. Ex. H.

   Throughout that day, both Beatty and Chavannes stood inside the barricades, at different

places along the path to the door, so that people entering the building would have to dodge first

one, then the other.  Betters Decl. ¶ 10.  Defendant Chavannes announced their intention to

physically obstruct access to the Center, shouting, "Y'all don't know what's coming.  Y'all don't

know what's coming.  We're going to block up this whole thing.  We're going to block this door.

We're going to block this door. Ain't nobody going into that door today."  Verrilli Decl. Ex. E.

9

In a video livestreamed to her Facebook page, Defendant Beatty announced to the camera while standing in front of the door, "We not moving. We standing here, so I guess no women will be coming in for abortions today. It's a warzone." Lyman Decl. ¶ 26, Ex. H.  Defendant Beatty continued to threaten escorts and staff with violence, stating, "We are violently pursuing the kingdom of God. Violently pursuing."  Betters Decl. Ex. I.

Defendants also coordinated with others to physically obstruct the Center on June 20, 2020.  Both Defendants positioned themselves in front of the main entrance, and Defendant Beatty directed other anti-abortion protesters to block the administrative entrance as well, while she and Chavannes positioned themselves in front of the main entrance.  Betters Decl. Ex. D. Later that day, Defendant Beatty moved to stand in front of the administrative entrance, leaned against the door, and, at one point, sat directly in front of the doorway with her back against the door.  Betters Decl. Ex. F.  When a patient arrived at the administrative entrance, Beatty refused staff members' requests to move aside from her position against the door, announcing, "They blocked that door, we're standing at this door." Betters Decl. Ex. H.  An escort had to reach behind Beatty and pull the door open before she finally moved, allowing the patient to enter. Betters Decl. Ex. H.

Defendant Beatty also directly threatened a volunteer with violence that day, explicitly threatened to knock her unconscious.  In talking about the assault that she committed in Maine, which led to her arrest and incarceration, Defendant Beatty bragged, "I knocked her out, all the way out.  With one hit, I hit her so hard that she was asleep on the floor… If I could rewind time, I'd do it again."  Lyman Decl. ¶30, Ex. K. She proceeded to threaten to do the same thing to the volunteer, saying, "If you put your hands on me, you might end up on the floor asleep for a

couple minutes."  When the volunteer objected, "That's a threat," Defendant Beatty agreed enthusiastically, "Yeah!"  *Id.*

In addition, Defendants harassed patients as they walked to the administrative entrance throughout the day; in one interaction captured on video, Chavannes followed a patient being escorted to the side entrance, shouting and pointing at her.  Betters Decl. Ex. E.

In July, Defendants returned to the Center and continued to position themselves right by the door, where they proceeded to follow and harass patients and staff within fifteen feet of the clinic, pound on the windows and scream inside the clinic, and yell at people from within inches without masks on.  Lyman Decl. ¶34, Ex. N.  Their conduct forced patients to choose between obtaining reproductive health care and protecting themselves from exposure to the virus.  *Id.*

Defendants returned to the Center in October 2020, at which point they filmed themselves defacing a sidewalk mural created in chalk by staff and escorts.  "Keep sending us tips on what they're doing, and we're gonna keep raining on their parade," Beatty announced.  Lyman Decl. ¶40, Ex. T.

Defendants returned to the Center just this past weekend, on Saturday, February 6, 2021. They spent approximately two hours standing right in front of the door, yelling into the faces of escorts from inches away while maskless, and forcing patients who entered to squeeze past them while they yelled in their faces.  Barnett Decl. ¶16, Ex. A; Lyman Decl. ¶42, Ex. U.  Defendants also screamed into the clinic after patients made it inside, and Defendant Beatty followed and harassed a patient's partner as he left the clinic, taunting him for wearing a mask and screaming at him to stop having sex.  Lyman Decl. ¶44, Ex. V.  Several patients entered the clinic crying, as a result of their encounter with Defendants, and others expressed concern about Defendants' unwelcome proximity to them without masks, during the pandemic.  Barnett Decl. ¶21, ¶22.-

11

## FEDERAL, STATE, AND CITY CLINIC ACCESS LAWS

**A.    Federal and State Law**

FACE and the NY Clinic Access Act are identical in their wording, and thus are analyzed by courts together. Courts' analyses and holdings regarding FACE are equally applicable to the NY Clinic Access Act.

In order to demonstrate a violation of FACE and the NY Clinic Access Act, Plaintiff must show that: (1) Defendants engaged in acts of "force," "threat of force," or "physical obstruction," (2) with the intent to "injure," "intimidate," or "interfere" with (or attempt to injure, intimidate, or interfere with) a person, (3) because that person has sought or provided, or is seeking to obtain or provide, reproductive health services or in order to discourage or intimidate such a person from obtaining or providing reproductive health services. 18 U.S.C. § 248(a)(l); N.Y. Penal Law § 240.70(l)(a) and (b). Such conduct is actionable when directed against not only patients and staff, but escorts as well. *United States v. Hill*, 893 F. Supp. 1034, 1039 (N.D. Fla. 1994) (finding that "Congress was concerned not only with the safety of doctors and nurses, but also with the safety of others who are essential to the provision of clinic services . . . [E]scorts are considered an integral part of the functioning of clinics," and thus FACE prohibits threats or violence against escorts and other volunteers).

**B.    City Law**

The NYC Clinic Access Act makes it unlawful to, among other things, (1) "knowingly physically obstruct or block" a clinic in order to impede access, or attempt to do so (by way of physical contact or otherwise), (2) "follow and harass another person within 15 feet of the premises of a reproductive health care facility," (3) engage in conduct within fifteen feet of the clinic that "places another person in reasonable fear of physical harm," or attempt to do so, or (4) "knowingly

interfere with the operation of a reproductive health care facility," or attempt to do so. N.Y.C. Admin. Code 10-1003.

## ARGUMENT

A party requesting a preliminary injunction must show "(1) irreparable harm; (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party; and (3) that a preliminary injunction is in the public interest." *New York v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) (quoting *Oneida Nation of New York v. Cuomo*, 645 F.3d 154, 164 (2d Cir. 2011) (internal quotation marks omitted)).[5]  As fully set forth below, the OAG clearly meets the three parts of this test for its claims under federal, state, and local law. Furthermore, the injunctive relief requested is narrowly tailored so that it will impose no greater burden than necessary on Defendants' First Amendment rights.  Indeed, the OAG seeks almost identical relief to that which was granted by the Southern District of New York in response to similar violations of clinic access laws at the Center in 2006.

## I.     PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS OF THE CLAIMS

Plaintiff has presented clear photographic and video evidence demonstrating that Defendants have violated federal, state, and local clinic access laws and is, therefore, likely to succeed on the merits of its claims.

---

[5] This standard was set forth by the U.S. Supreme Court in *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008), yet it has not been uniformly applied in this jurisdiction. Some courts in the Second Circuit have continued to use the pre-*Winter* ("traditional") standard, which does not include the third prong addressing public interest. *See NM v. Hebrew Acad. Long Beach*, 155 F. Supp. 3d 247, 256 (E.D.N.Y. 2016); *Devos, Ltd. v. Record*, No. 15-cv-6916, 2015 U.S. Dist. LEXIS 172929, at *20 (E.D.N.Y. Dec. 24, 2015); *Oliva v. Brookwood Coram I, LLC*, No. CV 14-cv-2513, 2015 U.S. Dist. LEXIS 179084, at *12-13 (E.D.N.Y. Nov. 30, 2015); *SymQuest Grp., Inc. v. Canon U.S.A., Inc.*, No. 15-cv-4200, 2015 U.S. Dist. LEXIS 114898, at *12 (E.D.N.Y. Aug. 7, 2015). The district court in *Vringo, Inc. v. ZTE Corp.*, clarified that in the Second Circuit a litigant seeking a preliminary injunction can either use the traditional/pre-*Winter* standard or the standard set forth in *Winter*. *Vringo, Inc. v. ZTE Corp.*, No. 14-cv-4988, 2015 U.S. Dist. LEXIS 71919, at *12 (S.D.N.Y. June 3, 2015). Here, we address the public interest prong, yet note that such a showing may not be necessary.

**A.      Defendants' Actions Violate Federal and State Clinic Access Laws**

As demonstrated below, Defendants violated FACE and the NY Clinic Access Act on multiple occasions.

Defendants routinely engage in prohibited behavior in an effort to interfere with access to the clinic and intimidate the clinic's staff and patients.  As noted above, the elements of FACE and the NY Clinic Access are that: (1) Defendants engaged in (a) acts of "force," (b) "threat of force," or (c) "physical obstruction"; (2) with the intent to "injure," "intimidate," or "interfere" with (or attempt to injure, intimidate, or interfere with) a person; (3) because that person has sought or provided or is seeking to obtain or provide, reproductive health services or in order to discourage or intimidate such a person from obtaining or providing reproductive health services. 18 U.S.C. § 248(a)(l); N.Y. Penal Law § 240.70(l)(a) and (b).  The OAG easily meets all three prongs.

> **1.      Defendants Engage in Force, Threats of Force, and Physical Obstruction**

Defendants have engaged in numerous types of conduct prohibited by FACE—only one of which is required to demonstrate a violation of the law.

> *a.      Defendants Have Engaged in Force*

FACE does not include a definition of "force," but federal courts have found that it is "broadly defined as 'power, violence or pressure directed against a person or thing.'"  *Cain*, 418 F. Supp. 2d at 473 (citing *Dickson v. Ashcroft*, 346 F.3d 44, 50 (2d Cir. 2003)). Accordingly, courts considering FACE claims have interpreted the term "force" to include acts of physical aggression and contact, such as hitting, pushing, shoving, or knocking into patients as well as escorts and staff. *See id.* at 474 (describing defendant's actions of pressing his body into an escort as well as pushing the escort…as "the clearest example of a use of force in violation of FACE."); *New York*

14

*v. Kraeger*, 160 F. Supp. 2d 360, 375 (N.D.N.Y. 2001) (noting that defendant used force when "[s]he accosted, yelled at, pushed and bumped into [a patient] . . . ." and finding that intentionally stepping on staff member's heels constitutes force).

There is no question that Defendants have committed acts of force.  On June 20, 2020, Defendant Beatty rammed her entire body into several escorts who had linked arms in an attempt to block her from entering the police barricades.  Verrilli Decl. Ex. D.  At the same time, Defendant Chavannes violently grabbed the barricades, yanking them out of the hands of escorts and staff and throwing them into the street while screaming at the escorts and staff.  *Id*.  This physical aggression by both Defendants is undoubtedly a use of force.

In the most egregious example of Defendant Beatty's use of force, her violent assault on a staff member, in an attempt to block access to the Center, resulted in serious bodily harm.  Verrilli Decl. Ex. F.  On June 20, 2020, Beatty used all her weight to force the door of the Center closed, and she repeatedly slammed the door on the hand of an escort who was trying to open the door to allow a doctor inside.  *Id.*  The staff member's bruised and swollen hand, injured by Defendant Beatty, required her to stop escorting patients into the Center due to the pain and have X-rays done several days later.  Verrilli Decl. Ex. G.

Finally, Beatty has repeatedly assaulted escorts—shoving one multiple times, Lyman Decl. Ex. I, J, and slapping another in the face. Verrilli Decl. Ex. H.  These incidents, captured on film, are undeniably uses of force.

The videos make clear that Defendants meet the first element of FACE and the NY Clinic Access Act by engaging in unlawful uses of force in their attempts to interfere with access to the clinic.

#### b.        *Defendants Deliver Threats of Force*

FACE and the NY Clinic Access Act further prohibit threats of force that create a reasonable apprehension in the recipient of bodily harm to herself or to another person. 18 U.S.C. § 248(e)(3); N.Y. Penal Law § 240.70(3)(c); *Kraeger*, 160 F. Supp. 2d at 373 (citing *United States v. Dinwiddie*, 76 F.3d 913, 925 (8th Cir. 1996); *Cheffer v. Reno*, 55 F.3d 1517, 1521 (11th Cir. 1995)). In the Second Circuit, the test of whether certain conduct is an actionable "true threat" "is an objective one—namely, whether an ordinary, reasonable recipient who is familiar with the context of the [communication] would interpret it as a threat of injury." *United States v. Turner*, 720 F.3d 411, 419-20 (2d Cir. 2013) (quoting *United States v. Davila*, 461 F.3d 298, 305 (2d Cir. 2006) (explaining that true threats may be prohibited without implicating First Amendment rights). In applying this test, the effect of the alleged threat on the recipient is relevant, while the intent of the maker to actually carry out the alleged threat is not.  *See Cain*, 418 F. Supp. 2d at 475.

Courts consider a variety of factors in determining whether a threat is a "true threat" under FACE, rather than protected speech, including: whether the threat is unequivocal and specific as to the person threatened, *New York v. Operation Rescue Nat'l*, 273 F.3d 184, 196 (2d Cir. 2001) *aff'd*, 240 F. App'x 430 (2d Cir. 2007); whether the threat is communicated directly to the victim; what the recipient's and other listeners' reactions are to the threats; and whether similar statements were made to the victim in the past. *Kraeger*, 160 F. Supp. 2d at 373 (citing *Dinwiddie*, 76 F.3d at 925).

In determining the reasonableness of a recipient's reaction, courts have taken into account the local and national climate of violence at clinics, and assaults on physicians and clinic staff in the area or elsewhere in the nation. *See, e.g.*, *Kraeger*, 160 F. Supp. 2d at 373 (citing *United States v. McMillan*, 53 F. Supp. 2d 895, 905 (S.D. Miss. 1999) ("*McMillan II*"); *United States v. Scott*,

958 F. Supp. 761, 774 (D. Conn. 1997) (citing *United States v. Gilbert*, 884 F.2d 454, 457 (9th Cir. 1989), cert. denied, 493 U.S. 1082). Thus, courts must "analyze an alleged threat in light of its entire factual context' and decide whether the recipient of the alleged threat could reasonably conclude that it 'expresses a determination or intent to injure presently or in the future." *Kraeger*, 160 F. Supp. 2d at 373 (quoting *Dinwiddie*, 76 F.3d at 925). (internal citations omitted).

Here, Defendants have been captured on camera making explicit threats of force in their campaign to interfere with and intimidate patients, staff, and escorts.   In a video taken on June 19, 2020, Defendant Chavannes can be seen screaming at a staff member who had opened the door, backing her up against the barricade and causing her to bend backwards over it. Chavannes shook her finger in the staff member's face while screaming, from inches away, "Do not touch me again!"  She did not stop until multiple police officers pulled her away.  Verrilli Decl. Ex. A.  Additional video shows the terrifying perspective of the staff member on the receiving end of those threats, Verrilli Decl. Ex. B, C; it is clear she had a reasonable fear that Chavannes was going to hit her.  Verrilli Decl. ¶13.

Chavannes' recorded actions are almost identical to the threats made against an escort in *Cain* and found to be a violation of FACE.  In that case, "Cain got close to her, pointed his finger in her face and screamed "stay out of my way. This is your last warning." 418 F. Supp. 2d at 465.  The court found that communication to be an implied threat, noting that, "An absence of explicitly threatening language does not preclude the finding of a threat." *Id.* at 476 (citing *United States v. Malik*, 16 F.3d 45, 49 (2d Cir. 1994)).  As in *Cain*, Chavannes "was extremely close to [to the escort], screaming, and pointing a finger in [her] face." *Id.*  There, the court concluded, "Any reasonable person on a sidewalk in Manhattan would, as the escort did, interpret such a statement as a threat." *Id.*   The same is equally true here.

Defendant Beatty has also been recorded threatening escorts.  In one video taken on June 20, 2020, Defendant Beatty threatened to knock an escort unconscious.  Lyman Decl. ¶30, Ex. K. She bragged about a prior assault, claiming to have knocked her victim out, and threatened to do the same to the escort.  *Id.*  Moreover, when the escort objected that Defendant Beatty had just made a threat, Beatty agreed enthusiastically.  *Id.*

Again, the analysis in *Cain* can be applied here.  There, the court found that "Cain's repeated warnings to escorts that harm would befall them if they got in his way again" were "true threats under the Second Circuit's standard." *Id.*  The court acknowledged that "[t]he threatened harm was, it is true, conditioned on the escort getting in Cain's way (or at least Cain thinking that they were in his way), but 'a conditional threat ... is nonetheless a threat.'" *Id.*  (citing *Malik,* 16 F.3d at 49).  Just as in *Cain*, Beatty's threat, albeit a conditional one, to harm the escort if she perceived an offense on her part, meets the standard for a true threat in the Second Circuit.

Further, Defendants' refusal to abide by COVID-19 social distancing protocols is calculated to threaten staff and clients with bodily harm.  As courts have acknowledged, "COVID-19 transmission increases when people are in close contact because the virus spreads through contact, respiratory droplets, and aerosols…To slow the spread of COVID-19, the Centers for Disease Control and Prevention recommends mask wearing and social distancing by keeping six feet away from other people and limiting contact with others outside your household, whether indoors or outdoors. *Columbus Ale House, Inc. v. Cuomo*, No. 20-CV-4291 (BMC), 2020 WL 6118822, at *1 (E.D.N.Y. Oct. 16, 2020), citing Scientific Brief: SARS-CoV-2 and Potential Airborne Transmission, Ctrs. Disease Control & Prevention (updated Oct. 5, 2020), https://www.cdc.gov/coronavirus/2019-ncov/more/scientific-brief-sars-cov-2.html.

In their attempts to obstruct access to the Center, Defendants have repeatedly and intentionally threatened escorts, patients, and staff with exposure to the coronavirus.  On numerous occasions, Defendants have refused their targets' requests to keep back and cover their faces, instead mocking their fear of harm and blatantly violating COVID-19 protocols.  Verrilli Decl. ¶6; Betters Decl ¶12.  Escorts, patients and staff reasonably fear of bodily harm from Defendants' screaming in their faces at close range while declining to wear masks. *See* Barnett Decl. ¶12; Lyman Decl ¶9.

Clearly, both Beatty and Chavannes have made clear threats of force against escorts and staff, as prohibited by FACE and the NY Clinic Access Act.

### c.      *Defendants Engage in Physical Obstruction*

FACE and the NY Clinic Access Act define physical obstruction as either "rendering impassable ingress to or egress from a facility" or "rendering passage to or from such a facility...unreasonably difficult or hazardous." 18 U.S.C. § 248(e)(4); N.Y. Penal Law § 240.70(3)(d).  A plaintiff need not show that a clinic was shut down, that people could not enter for a period of time, or that anyone actually was denied medical services in order to establish a violation of FACE or the NY Clinic Access Act. *See Kraeger*, 160 F. Supp. 2d at 373 (citing *United States v. Gregg*, 32 F. Supp. 2d 151, 156 (D.N.J. 1998) (citations omitted), *aff'd*, 226 F.3d 253 (3d Cir. 2000)); *United States v. Roach*, 947 F. Supp. 872, 876 (E.D. Pa. 1996) ("Neither physical injury to patients or staff nor actual entry into the clinic by the protesters is required for conduct to fall within the definition of 'physical obstruction.'").  Courts have held that encountering interference and harassment while attempting to enter or leave a clinic meets the "unreasonably difficult or hazardous" standard. *See Kraeger*, 160 F. Supp. 2d at 373; *Gregg*, 32 F. Supp. 2d at 156; *Scott*, 958 F. Supp. at 775-76; *United States v. White*, 893 F. Supp. 1423, 1427,

19

1431-32, 1439 (C.D. Cal. 1995); *United States v. Lindgren*, 883 F. Supp. 1321, 1330-31 (D.N.D. 1995).

As the video and photographic evidence clearly shows, Defendants have physically obstructed access to the Center and explicitly coordinated with others to do the same.  On June 19, 2020, for example, as Chavannes and Beatty continued to stand directly in front of the door, a patient approached their obstruction of the main entrance and had to be led to the side entrance by escorts.  Betters Decl. Ex. B.  On June 20, 2020, Defendants instructed other anti-abortion protesters to block the administrative entrance while they positioned themselves right in front of the main entrance.  Betters Decl.  Ex. D.  That same day, Defendant Beatty sat directly in front of the doorway with her back against the door.  Betters Decl. Ex. F.  She refused to move aside to let a patient enter the clinic, saying, "They blocked that door, we're standing at this door." Betters Decl. Ex. H.  Eventually, an escort managed to pull the door open from behind Beatty, prompting her to finally move aside and allow the patient to enter.  Betters Decl. Ex. H.  This precise action at this precise location has already been found to be unlawful.  In *Cain*, the district court found that "standing directly in front of the Center door and refusing to move until a security guard approaches" constituted physical obstruction that violated FACE. 418 F. Supp. 2d at 480.

Moreover, courts have made clear that the prohibition on obstructing clinic entrances in FACE "does not limit physical obstruction to bodily obstruction, but rather is broadly phrased to prohibit any act rendering passage to the facility unreasonably difficult."  *U.S. v. Mahoney*, 247 F.3d 279, 284 (D.C. Cir. 2001) (citing 18 U.S.C. § 248(e)(4)).  In *Mahoney*, the D.C. Circuit found a violation of FACE where the defendant had been kneeling and praying outside of the emergency exit where patients did not typically enter, thus forcing patients to navigate the

crowds at the other entry point. *Id.* This constituted unlawful physical obstruction because it compelled patients to pass through a "crowded and chaotic" scene to enter the clinic. *Id.* In *New York v. Operation Rescue National*, the district court held that defendants' interference with pedestrians "as they approach the building, shouting at them and standing in front of them as the pedestrians tried to enter the building" violated FACE. 273 F.3d at 194.

The COVID-19 pandemic and related public health guidelines add extra urgency to the law's prohibition on physical obstruction. Even prior to the pandemic, Courts have confirmed that obstruction includes behaviors such as pacing in a manner that monopolizes a narrow walkway, crowding, and failing to yield to clinic visitors. *See Kraeger*, 160 F. Supp. 2d at 370, 378. Now, in the midst of this global health crisis, engaging in such behavior while refusing to wear a face covering additionally risks transmitting COVID-19. As a result, approaching unwilling listeners at close range while maskless and shouting at them creates unreasonably hazardous conditions for patients and staff. Forcing close and unprotected contact during a pandemic, in defiance of public health warnings, is more than "unpleasant" or "emotionally difficult;" it makes clinic access unreasonably challenging and hazardous and impedes patients from entering the clinic. *Cf. Operation Rescue Nat'l,* 273 F.3d at 195.

Beatty's and Chavannes's insistence on standing right by the door, while maskless and yelling at all who enter, leaves no opportunity to maintain a safe distance and thereby creates unreasonably difficult and hazardous conditions for those seeking to access or provide reproductive health services. Barnett Decl. ¶12, Lyman Decl ¶9. On or about June 6, 2020, Defendant Chavannes screamed so closely in the ear of a staff member who was trying to walk into the Center to go to work that some of her spit hit him on the head. Barnett Decl. ¶13. Being on the receiving end of a stranger's saliva, while clearly making for an unreasonably difficult and

unpleasant commute to work in normal times, is nothing short of a physical danger during a pandemic.

In sum, the OAG has met the first element of FACE and the NY Clinic Access Act by documenting Defendants' acts of force, threats of force, and physical obstruction by Defendants, which make access to the Center unreasonably difficult or dangerous, in violation of the law.

### 2.    Defendants Possess the Requisite Intent and Motives Under Federal and State Law

The second and third elements of FACE and the NY Clinic Access Act, which address a defendant's intent and motives, can be considered together: whether Defendants' obstruction, use of force, and threats of force are intentional, and whether Defendants engage in this conduct "because" the persons to whom it is directed are obtaining and providing reproductive health services or in order to discourage or intimidate such a person from obtaining or providing reproductive health services. *See* 18 U.S.C. § 248(a)(l); N.Y. Penal Law § 240.70(l)(a)-(b).

As the Second Circuit held in *United States v. Dugan*, 450 F. App'x 20 (2d Cir. 2011), these elements do not refer to the defendants' ultimate purpose, *id*. at 22; thus, if defendants mean to engage in the acts they commit and the logical and natural intended result of those acts is to physically obstruct patients and staff, or to threaten them, then the intent element of the statute is satisfied. *See also United States v. Weslin*, 156 F.3d 292, 298 (2d Cir. 1999) ("No matter what their ultimate purpose in blockading the clinic may have been, the defendants do not deny—nor could they plausibly deny—that they meant to block the entrances to the . . . clinic . . . and that they did so because they wished to prevent the clinic from performing abortions.").

Defendants far surpass this low standard.  They have broadcast and admitted their intention to shut down the Center through harassment, obstruction, and intimidation.  On a live video feed Beatty streamed on Facebook on June 19, 2020, she announced, "This is war…We are going to

destroy the works of the enemy."  A few minutes later, she declared, "We are going to terrorize this place…We are going to terrorize you so good that your business will be over."  Lyman Decl. ¶24, Ex. G.  Similarly, Defendants have broadcast their intention to physically obstruct access to the Center in order to block the ability of the Center to treat patients.  On June 20, 2020, Defendant Chavannes was recorded shouting, "We're going to block this door. Ain't nobody going into that door today."  Verrilli Decl. ¶ 22, Ex. E.  That same day, while standing in front of the clinic's main entrance, Defendant Beatty announced, "We standing here so I guess no women will be coming in for abortions today." Lyman Decl. ¶ 26, Ex. H.

Defendants act with the express purpose of discouraging the rendering or receipt of any reproductive health-care service: they interfere with patients because they seek reproductive health care; and they interfere with providers because they seek to provide such care. The language that Defendants use to harass patients leaves no question about this motive.  Defendants thus have acted with the requisite intent "because" they target persons that seek to or have obtained or provided reproductive health services or wish to discourage individuals from obtaining or providing reproductive health services.

Accordingly, the OAG meets the second and third prongs of FACE and the NY Clinic Access Act.

**B.      Defendants' Actions Violate the NYC Clinic Access Act**

Defendants engage in conduct that violates the city law in a number of ways.  Like the federal and state clinic-access laws, the NYC Clinic Access Act also bans physical obstruction, or attempted physical obstruction of a clinic.  In addition, the city law prohibits Defendants from following and harassing people outside the clinic, trying to put people in fear of physical harm, and generally interfering with the clinic's operation. Because Defendants continuously and

routinely engage in these types of unlawful conduct, Plaintiff demonstrates a likelihood of success on the merits of this claim.

### 1. Defendants' Conduct is Prohibited by the City Law

Defendants' physical obstruction of the Center, which violates federal and state law, also violates the NYC Clinic Access Act.  N.Y.C. Admin. Code § 10-1003(a)(2) (making it unlawful "[t]o knowingly obstruct or block the premises of a reproductive health care facility, so as to impede access to or from the facility, or to attempt to do the same.")  The discussion of Defendants' physical obstruction, *supra*, is therefore equally applicable here.  Further, every instance in which Defendants announce that they are blocking, intending to block, or instructing others to block the entrance is undoubtedly an attempt to block access to the Center, which is prohibited by the City law.  Verrilli Decl. ¶ 22, Ex. E; Lyman Decl. ¶ 26, Ex. H.

In addition, Defendants have violated three additional provisions of the City law.  The ordinance makes it unlawful to "follow and harass another person within 15 feet of the premises of a reproductive health care facility"; *id.* at 10-1003(a)(3); "engage in a course of conduct or repeatedly commit acts within 15 feet of the premises of a reproductive health care facility when such behavior places another person in reasonable fear of physical harm, or to attempt to do the same," *id.* at 10-1003(a)(4); and "knowingly interfere with the operation of a reproductive health care facility, or to attempt to do the same," *id.* at 10-1003(a)(6).  Defendants have violated all three provisions.

#### a. Defendants Routinely Follow and Harass People Within 15 Feet of the Clinic

The city law prohibits following and harassing anyone within fifteen feet of the "premises of a reproductive health care facility," which is defined as "the driveway, entrance, entryway, or

24

exit of a reproductive health care facility and the building in which such facility is located and any parking lot in which the facility has an ownership or leasehold interest." N.Y.C. Admin. Code § 10-1002.

Here, Defendants conduct all their activities on the sidewalk outside the Center, which is within fifteen feet of the building, if not directly in front of the entrance.  Witnesses have described how Defendants have followed patients and staff and screamed at them at close range, while refusing requests for Defendants to leave them alone. Verrilli Decl. ¶6; Betters Decl. ¶12.  Notably, Defendants are not sidewalk counselors; they do not hand out leaflets or other literature, and they make no attempt to have "personal, caring consensual conversations" with patients.  *Cf. McCullen v. Coakley*, 573 U.S. 464, 466, 489 (2014).   To the contrary, they spend their time harassing patients, staff members, and escorts by following them around in an intimidating manner and yelling at them from close range.  On June 20, Chavannes can be seen on video following a patient being escorted to the side entrance, shouting and pointing at her.  Betters Decl. Ex. E.  On July 25, 2020, Beatty can be seen shouting at a man leaving the clinic, pointing her finger in his face, and following him as he walks away down the street.  Lyman Decl. Ex. N.  This bullying behavior falls far outside the "classic forms of speech that lie at the heart of the First Amendment."  *Schenck v. Pro-Choice Network of Western New York*, 519 U.S. 357, 377 (1997).

### b.    *Defendants Engage in Conduct That Places People in Reasonable Fear of Physical Harm*

As discussed above, Defendants' verbal and nonverbal conduct places people in reasonable fear of physical harm. Defendants' ongoing unlawful conduct—using force and making threats of force, as described above—puts patients, staff, and escorts in reasonable fear for their safety. Further, every announcement of their plans to "terrorize" the clinic, Lyman Decl. ¶24, Ex G; to turn it into a "warzone", Lyman Decl. ¶ 26, Ex. H; or to "violently pursue" their goal of shutting

down the clinic, Betters Decl. Ex. I, is an admission that they are attempting to put all those affiliated with the clinic in fear of physical harm. Finally, staff and escorts have expressed reasonable fear of contracting the virus from Defendants' refusal to wear masks while shouting at them at close range.  Verrilli Decl. ¶ 6; Barnett Decl. ¶ 12-14; Lyman Decl. ¶ 9.

### c.   Defendants Interfere with the Operation of the Clinic in General

Above and beyond their use of force and threats of force, Defendants knowingly interfere with the Center's operations, and attempt to do so, by pounding on the windows and screaming inside. Several videos show Beatty and/or Chavannes screaming into the window of the Center at patients and staff inside.  *See, e.g.* Lyman Decl. Ex. A, N.  Further, Defendants' screaming has interfered with the medical staff's ability to conduct screening for Covid symptoms.  Barnett Decl. ¶11; Lyman Decl. ¶10.

The plain language of the city law prohibits *any* interference or attempts at interference – physical or otherwise – with the operation of the clinic.  Here, Defendants have repeatedly disrupted the operations of the Center, and attempted to do so, by kicking the glass and screaming through the window or door, even after the staff or patient made it inside the building.

### 2.   There Is No Intent Requirement Under the City Law

The city law has no intent requirement for certain covered conduct, such as following, harassing, and placing persons in reasonable fear of physical harm.  Nonetheless, Defendants have knowingly engaged in other conduct, such as obstructing, blocking, and interfering with the clinic, in violation of the city law, as discussed *supra*.

## II.   PLAINTIFF DEMONSTRATES IRREPARABLE HARM

Plaintiff has established that, absent injunctive relief, the People of New York will suffer irreparable harm.  First, under federal and state clinic-access laws, irreparable harm is presumed.

Second, under the city law, it is well-established that acts of force, obstruction, and threats, such as those committed by Defendants, cause irreparable injury to patients seeking reproductive health care, the staff providing such services, and the public in general. The OAG easily meets the applicable standard for all of its claims.

## A.    Irreparable Harm Is Presumed under FACE and the NY Clinic Access Act

It is well-established that "when a statute authorizes the government to seek preliminary injunctive relief but does not specifically require proof of irreparable harm," irreparable harm is presumed and need not be proven. *See City of New York v. Golden Feather Smoke Shop, Inc.*, 597 F.3d 115, 121 (2d Cir. 2010) ("[T]he City [of New York] was not required to make a showing of irreparable harm to obtain an injunction under [the statutes at issue because] [b]oth statutes authorize injunctive relief for violations . . . of their provisions."); *United States v. Narco Freedom, Inc.*, 95 F. Supp. 3d 747, 754 (S.D.N.Y. 2015) ("when, as here, a statute authorizes the government to seek preliminary injunctive relief but does not specifically require proof of irreparable harm, no such showing is required.").

FACE and the NY Clinic Access Act expressly authorize the Attorney General to seek an injunction to prevent violations of the statutes. 18 U.S.C. § 248(c)(3); N.Y. Civ. Rights Law § 79-m.[6]  Indeed, FACE's legislative history reveals that Congress believed that the conduct that FACE was designed to eradicate was *per se* causing irreparable harm. H.R. Rep. No. 103-306, at 6 (1993), reprinted in 1994 U.S.C.C.A.N. 699, 703 (FACE was enacted to "put a stop to the violence and disorder and to restore access to constitutionally protected rights"). Given this Congressional mandate, courts have held that once plaintiffs demonstrate a likelihood that FACE violations have

---

[6] The NY Clinic Access Act is codified in two parts of New York law: the Penal Law defines the prohibited conduct, N.Y. Penal Law §§ 240.70-240.71, and the Civil Rights Law authorizes the Attorney General to seek an injunction against that conduct, N.Y. Civ. Rights Law§ 79-m.

occurred, irreparable harm is presumed. *See Roach*, 947 F. Supp. at 877 (holding that once government demonstrated likelihood of success on FACE claim, irreparable injury would be presumed); *see generally United States v. William Savran & Assoc.*, 755 F. Supp. 1165, 1179 (E.D.N.Y. 1991) ("[W]here Congress has provided for Governmental enforcement of a statute by way of an injunction . . . irreparable harm need not be demonstrated . . . so long as the statutory conditions are met, irreparable harm . . . is presumed.").

Plaintiff has shown that Defendants have violated FACE and the NY Clinic Access Act. Irreparable harm is thus presumed, and Plaintiff meets the first part of the test for a preliminary injunction for its state and federal claims.

**B.      Defendants Are Causing Irreparable Harm**

Even without the presumption of harm conferred by the state and federal statutes, courts repeatedly have held that irreparable harm is caused by the type of aggressive and unlawful activity in which Defendants are engaged.

For example, in *Cain*, the court found that conduct similar to the behavior at issue here caused irreparable harm by impeding access to health-care facilities: "Women denied access [to medical facilities] cannot be compensated by money damages; injunctive relief alone can assure them the clinics' availability. . . . The irreparable harm flowing from defendants' activities – including the medical risks and the denial of constitutionally guaranteed rights – is real and threatens to continue." 418 F. Supp. 2d at 473 (quoting *New York State NOW v. Terry*, 886 F.2d 1339, 1362 (2d Cir. 1989) (internal citations omitted)).

Numerous other courts have reached the same conclusion, finding irreparable harm where anti-choice protesters have engaged in the types of obstruction and threats alleged here. *See, e.g.*, *United States v. Burke*, 15 F. Supp. 2d 1090, 1095 n.6 (D. Kan. 1998) ("[A]ggressive acts have

had adverse impact on the emotional state of women seeking clinic services and the physical well-being of employees at the clinic."); *United States v. McMillan*, 946 F. Supp. 1254, 1268 (S.D. Miss. 1995) ("McMillan I") (finding irreparable harm in threats of force against clinic patients and workers that inhibit their exercise of their constitutional rights to obtain and provide reproductive health services); *Lindgren*, 883 F. Supp. at 1331-32 (finding threat of irreparable harm where defendants' conduct physically obstructed patients' access to legal abortion services).

Defendants' unlawful conduct — including their physical obstruction of the Center entrance, acts of force and threats of force, as well as their screaming inside the Center and banging on the windows — has interfered with the Center's ability to provide patient care and thus harmed women seeking legal reproductive health services.  Thus, unless enjoined, Defendants' conduct will continue to inflict irreparable harm on patients, staff, and the public at large.

## III.   PLAINTIFF DEMONSTRATES THAT INJUNCTIVE RELIEF WOULD PROMOTE THE PUBLIC INTEREST

In deciding whether to grant a preliminary injunction, courts must consider the public consequences of the requested injunctive relief.  *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008). Thus, the moving party must demonstrate that a preliminary injunction would be in the public interest. *See Oneida Nation of N.Y.*, 645 F.3d at 164; *Tutor Time Learning Ctrs., LLC v. KOG Indus.*, No. 1:12-CV-4129, 2012 U.S. Dist. LEXIS 162124, at *20 (E.D.N.Y. Nov. 13, 2012); *see also Defario v. City of Syracuse*, 193 F. Supp. 3d 119, 131 (N.D.N.Y. 2016) ("[T]he Court generally assumes that the acts of a governmental entity are aligned with the interests of the public it serves.").

Congress has determined that FACE serves the public interest "by ensuring that individuals who seek to provide or obtain reproductive health services can do so free from unlawful interference." *Roach*, 947 F. Supp. at 877. Further, Congress specifically authorized state

Attorneys General to bring a civil action "when he or she has reasonable cause to believe that any person or group of persons may be injured by the conduct prohibited by FACE."[7] *McMillan I*, 946 F. Supp. at 1269.

Courts have accordingly found that granting injunctive relief to prevent FACE violations promotes the public interest.[8] *See Burke*, 15 F. Supp. 2d at 1095 (finding no harm to the public if the court orders an injunction); *Roach*, 947 F. Supp. at 877 ("Congress determined that FACE serves the public interest by ensuring that individuals who seek to provide or obtain reproductive health services can do so free from unlawful interference."); *McMillan I*, 946 F. Supp. at 1269 ("[A]n injunction will promote and serve the public interest by protecting the interests that FACE was designed to protect," and because "it will help to keep clinic workers safe from harm by affording protection from the defendant's threats or any irrational impulses to act upon the threats. Consequently, women's access to safe and vital reproductive health care will be ensured."); *Lindgren*, 883 F. Supp. at 1327-28, 1332 (finding that while the public has an interest in preserving the right of all individuals to speak freely, including the right to speak freely on abortion, the public also has an interest in seeing that FACE is upheld as well as having the legal rights of citizens upheld, and not having those rights frustrated by unlawful acts). In ordering an almost identical injunction as requested here, in *Cain*, the court observed that there was "little question that this type of injunction serves significant governmental interests." 418 F. Supp. 2d at 484 (citing *Operation Rescue Nat'l*, 273 F.3d at 202). The court concluded, "The combination of interests

---

[7] The New York State legislature enacted the NY Clinic Access Act to protect access to reproductive health services. N.Y. Penal Law §§ 240.70-240.71. The New York State Attorney General is authorized to seek injunctive relief for violations of the Clinic Access Act. N.Y. Civ. Rights Law § 79-m. Similarly, the NYC Clinic Access Act was enacted to protect the public health, safety and welfare by prohibiting interference with access to reproductive health care services. NYC Administrative Code § 8-801. Since FACE serves the public interest, the state and city laws – which were enacted to protect access to reproductive health-care services – demonstrably serve the public interest as well.

[8] Because the public-interest prong of the preliminary injunction standard emerged in the Second Circuit after *Winter*, there are no Second Circuit FACE cases analyzing whether a preliminary injunction would serve the public interest. However, as discussed below, other circuits have considered the public interest in the clinic-access context.

served by injunctive relief in this case are clearly sufficient to justify restrictions on the defendants' protest behavior." *Id.* at 485.

After all, in addition to violating FACE, Defendants' physical obstruction of the clinic and their campaign of harassment interfere with the public's right to obtain medical services. Courts have found it significant if women who obtain medical procedures are emotionally upset prior to or during the medical procedure, because it prevents them from receiving optimal care. *See Madsen v. Women's Health Ctr.*, 512 U.S. 753, 782 n.5 (1994) ("[P]atients manifested a higher level of anxiety causing those patients to need a higher level of sedation to undergo the surgical procedures, thereby increasing the risk associated with such procedures."); *Kraeger*, 160 F. Supp. 2d at 369 ("[P]atients arrive nervous and upset. Staff members have to spend time calming patients down before the purpose of their visit can be addressed."); *Scott*, 958 F. Supp. at 767 ("[I]nterfering with a patient's access to [the clinic] can increase the patient's stress level, and thereby increase the risks of a subsequent abortion procedure" including post-operative risks). Since the desire to obtain medical services is common to all New York residents, injunctive relief would serve the public interest. *See Cain*, 418 F. Supp. 2d at 483 (citing *Terry*, 886 F.2d at 1362).  Here, staff have seen patients react to Defendants by crying, appearing scared or intimidated, or getting upset and angry. Barnett Decl. ¶7, 21, 21.

Given Defendants' repeated violations of federal, state, and local clinic access laws, their disruption of the clinic's ability to provide reproductive health services, as well as their ongoing interference with the public's ability to move freely along the sidewalk by the clinic, Plaintiff respectfully submits that an injunction would be in the public interest.

31

## IV.   THE REQUESTED RELIEF IS NARROWLY TAILORED TO ADDRESS DEFENDANTS' VIOLATIONS OF LAW

In light of Defendants' multiple and well-documented violations of federal, state, and local clinic access laws, Plaintiff proposes that the Court issue the attached proposed order, which mirrors that which was issued in *Cain.*[9]  As the court in *Cain* explained, this injunction burdens no more speech than necessary to serve the significant government interests at stake.  It noted that other than the establishment of a buffer zone, the remaining provisions "essentially enjoin the defendants from engaging in conduct that is prohibited by FACE, or otherwise illegal. These provisions do not raise First Amendment concerns for the same reasons that the statute itself passes constitutional muster." 418 F. Supp. 2d at 485 (citing *Weslin,* 156 F.3d at 297).

With respect to the proposed buffer zone, it is well established that such zones are appropriate and lawful to address conduct like that presented here.  The U.S. Supreme Court has approved the use of buffer zones to protect reproductive health facilities and their patients and staff. *See Schenck*, 519 U.S. at 380-85; *Madsen*, 512 U.S. at 768-71. Likewise, the Second Circuit and federal district courts in New York and around the country have found buffer zones to be both necessary and constitutional. *See New York v. Operation Rescue National*, 273 F.3d at 208; *Cain*, 418 F. Supp. 2d at 486-87; *Kraeger*, 160 F. Supp. 2d at 378-79; *United States v. Scott*, No. 3:95-CV-1216, 1998 U.S. Dist. LEXIS 6716, at *6 (D. Conn. Mar. 16, 1998), *aff'd*, 187 F.3d 282 (2d Cir. 1999); *McMillan I*, 946 F. Supp. at 1270; *White*, 893 F. Supp. at 1440.

---

[9] The only modification proposed is to alter the *Cain* court's prohibition on yelling in the street—which was found in that case to pose a public nuisance—and instead prohibit Defendants from yelling into the Center and banging on its windows, which violates the NYC Clinic Access Act's prohibition on interfering with the operations of the clinic, as discussed *supra*.  (The city law had not been enacted at the time the *Cain* order was issued.)  In addition, the proposed order requires compliance with the governor's executive orders regarding mask-wearing and social distancing for so long as those orders remain in place.

In order for an injunctive buffer zone to avoid imposing unlawful limits on a protester's First Amendment rights, it must be: (1) content neutral, and (2) narrowly tailored so as to "burden no more speech than necessary to serve a significant government interest." *Madsen*, 512 U.S. at 765. Here, the proposed buffer zone is content neutral because it is not a regulation of speech, but "[r]ather, it is a regulation of the places where some speech may occur," *Hill v. Colorado*, 530 U.S. 703, 719 (2000), and because its restrictions are justified "'without reference to the content of the regulated speech,'" *Madsen*, 512 U.S. at 763 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)); *see Schenck*, 519 U.S. at 374 n.6 (rejecting argument the injunction is an unlawful prior restraint because it leaves alternative channels of communication open; granting injunction not because of content of expression but because of prior unlawful conduct). Further, the proposed buffer zone burdens no more speech than necessary because it restricts Defendants' access to only that portion of the sidewalk as is needed to promote the government's significant interests in protecting a women's freedom to seek pregnancy-related services, ensuring public safety and order, and protecting the medical privacy of patients whose psychological and physical well-being are threatened. *Madsen*, 512 U.S. at 767-68 ("We think a standard requiring that an injunction "burden no more speech than necessary" exemplifies "precision of regulation."); *see also McCullen*, 573 U.S. at 486 (finding that unlike content-based restrictions, such injunctions need not be the least restrictive or intrusive means of serving the governmental interest, but cannot regulate speech that does not advance its goals); *Schenck*, 519 U.S. at 376 (ensuring public safety is a significant governmental interest). The Supreme Court has held "that the combination of these governmental interests is quite sufficient to justify an appropriately tailored injunction to protect them." *Madsen*, 512 U.S. at 768.

There is no formulaic size for a buffer zone; rather, courts exercise their discretion to craft a zone that eliminates the threat to governmental interests posed by the defendants' conduct while protecting defendants' First Amendment rights. *See Schenck*, 519 U.S. at 381 (deferring to district court's assessment of number of feet necessary to keep clinic entrances clear); *Madsen*, 512 U.S. at 769-70 (same). Thus, courts have upheld, over First Amendment challenges, buffer zones of up to 500 feet. *See Dinwiddie*, 76 F.3d at 928-29 (500 feet); *Murray v. Lawson*, 138 N.J. 206, 234 (1994) (100 feet); *Planned Parenthood of Shasta-Diablo, Inc. v. Williams*, 10 Cal. 4th 1009, 1021 (1995) (sixty feet); *Schenck*, 519 U.S. at 367, 380-8 (fifteen feet); *New York v. Operation Rescue National*, 273 F.3d at 190 (fifteen feet).

In *Schenck*, the Supreme Court approved a fifteen-foot buffer zone, because it was necessary to ensure access; without a buffer zone, defendants "would not merely engage in stationary, nonobstructive demonstrations but would continue to do what they had done before: aggressively follow and crowd individuals right up to the clinic door and then refuse to move, or purposefully mill around parking lot entrances in an effort to impede or block the progress of cars." 519 U.S. at 381-82.

In *Cain*, the court held, in ordering the precise injunction sought here, "this buffer zone does not restrict more speech than necessary." 418 F. Supp. 2d at 486. Noting the Second Circuit standard, the court explained, "buffer zones immediately around entrances ... are narrowly tailored to ensure clinic access and to burden no more speech than is necessary." *Id.* (quoting *Operation Rescue Nat'l,* 273 F.3d at 204). The court went on to note, "This particular buffer, moreover, is not so large as to 'significantly curtail the exercise of First Amendment rights in the public areas around' the Center." *Id.* (citing *Operation Rescue Nat'l,* 273 F.3d at 205). It noted that the buffer zone left over sixty square feet of sidewalk, directly opposite the Center entrance, in which

defendants were free to carry out their protest activities. "This dedicated space, running more than twenty-two feet long, preserves opportunity for 'picketing and communication from a normal conversational distance along the public sidewalk.'" *Id.* at 486-87 (citing *Operation Rescue Nat'l,* 273 F.3d at 206). There was accordingly "no 'effective prohibition of close range communication in public areas near" the Center.'" *Id.* at 487 (citing *Operation Rescue Nat'l,* 273 F.3d at 206).

Finally, the court observed that "the injunction is minimally intrusive on defendants' rights," as it "leaves open ample alternative channels for communication." *Id.* (quoting *Hill,* 530 U.S. at 726). Ultimately, "defendants are left with ample public space around the Center to carry out their activities without restriction, including the entire sidewalk on the west side of Mott Street." *Id.*

In sum, the proposed buffer zone is no more burdensome than necessary to protect the significant governmental interests in protecting access to reproductive health services, ensuring public safety, and protecting patients' medical privacy.

## CONCLUSION

In order to address to Defendants' unlawful uses of force, threats, physical obstruction, and harassment to obstruct access to reproductive health care at the Manhattan Health Center, Plaintiff respectfully requests that its motion for a preliminary injunction be granted.

Dated: New York, New York
February 8, 2020

LETITIA JAMES
Attorney General of the State of New York

By:      _____/s/ Sandra Pullman_____
Sandra Pullman
Senior Counsel
Sandra.Pullman@ag.ny.gov

Heather McKay
Assistant Attorney General
Heather.McKay@ag.ny.gov
(*pending admission to the SDNY*)

Office of the New York State Attorney General
Civil Rights Bureau
28 Liberty St.
New York, New York 10005
(212) 416-8250